**FRIENDS FOR ALL CHILDREN, INC.,** as legal guardian and next friend of the named 150 infant individuals, et al., Plaintiff,

v.

**LOCKHEED AIRCRAFT CORPORATION,** Defendant and Third-Party Plaintiff,

v.

**The UNITED STATES of America,** Third-Party Defendant.

**Margali Jose Patricia MAUPOINT,** etc., Plaintiff,

v.

**LOCKHEED AIRCRAFT CORPORATION,** Defendant and Third-Party Plaintiff,

v.

**The UNITED STATES of America,** Third-Party Defendant.

**Civ. A. Nos. 76–0544, 76–0544–68.**

United States District Court, District of Columbia.

March 16, 1984.

On Partial Summary Judgment April 4, 1984.

On Application of the Adverse Inference Rule April 19, 1984.

As Corrected April 27, 1984.

See also D.C., 87 F.R.D. 560; D.C.Cir., 717 F.2d 602.

J. Vernon Patrick, Jr., Berkowitz, Lefkovits & Patrick, Birmingham, Ala., Oren R. Lewis, Jr., Lewis, Wilson, Lewis & Jones, Ltd., Arlington, Va., for plaintiffs.

Carroll E. Dubuc, Finley, Kumble, Wagner, Heine, Underberg & Casey, Washington, D.C., for defendant and third-party defendant.

Mark A. Dombroff, Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for third-party defendant.

Charles R. Work, McDermott, Will & Emery, Washington, D.C., for Guardian Ad Litem.

## MEMORANDUM [1]

OBERDORFER, District Judge.

This litigation is before the Court on plaintiffs' motions for partial summary judgment and a preliminary injunction. The 70 or so plaintiffs are orphans who were aboard a Lockheed-built and Air Force-operated C–5A military transport plane when it crashed near Saigon, Vietnam, on April 5, 1975, and who were subsequently adopted by families in Europe and Canada. The first of these foreign infant cases, that of the French child Margali Maupoint, is set for trial on April 3, 1984. Through their guardian *ad litem* and counsel, plaintiffs have now requested that the Court enter a partial summary judgment and preliminary injunction against the defendant that would require defendant to pay the large sum of $8,700,000.00 for guardian's fees, attorneys' fees, diagnostic examinations, medical treatment, and education services, pending the outcome of the 70-odd trials on the merits.

During an exhaustive hearing on these motions, plaintiffs presented evidence and testimony to support their contention that, at trials on the merits, juries should be permitted to draw inferences adverse to the defendant from the wholesale destruction of crash-related photographs, videotapes, and documents which occurred after this litigation commenced. Plaintiffs also argued that at a trial on the merits, defendant would be precluded by the collateral source rule from introducing evidence at trials that free or subsidized health care is available to these plaintiffs in the countries where they reside. These two issues of adverse inference and collateral source have been fully briefed in the *Maupoint* case, and are ripe for decision.

A careful review of the evidence adduced at the hearing, the arguments of counsel,

---

1. Separate Orders filed in No. 76–0544 and 76–0544–68 on February 23, 1984 (attached as exhibits), referred to a memorandum to be filed.

This is that memorandum. In addition, a supplemental memorandum with detailed findings of fact and conclusions of law is forthcoming.

and the applicable law demonstrates that plaintiffs are not now entitled to most of the considerable relief *pendente lite* which they seek. They are not now entitled to ask triers of fact to draw an inference adverse to the defendant under the current law in this Circuit. Nor are they now entitled to a partial summary judgment or a preliminary injunction awarding them the costs of interim medical *treatment,* or interim education expenses, or the fees of the guardian *ad litem,* or the attorneys' fees incurred in litigating these motions.[2] Plaintiffs have, however, shown that the collateral source rule precludes admission of evidence at subsequent plenary trials on damage claims that plaintiffs will receive free or subsidized care in Europe and Canada. More significantly, they have convincingly demonstrated that they are entitled to a partial summary judgment that the defendant is liable for the provision of reasonable *diagnostic* examinations of the children. The actual cost of reasonable examinations for each child is in genuine dispute. Nevertheless, plaintiffs have also shown that they are entitled to a preliminary injunction requiring defendant to provide appropriate *diagnostic* examinations promptly. Defendant has presented evidence that this cost should be substantially less than what plaintiffs' experts anticipate, and although plaintiffs dispute this, the total cost to defendant of these examinations will be a fraction of the large fund sought by plaintiffs and will be minimized by the watchdog and reverter provisions built into the preliminary injunction.

These results follow from the testimony of the doctors, parents, health care experts, Lockheed and Air Force officials, and other witnesses at the three week hearing on the motions; from the thousands of exhibits admitted into evidence; from the exhaustive briefs of the parties and their proposed findings of fact and conclusions of law;

from a review of the dozens of pre-and post-hearing motions of the parties; and frofm a familiarity with the hundreds of thousands of pages of record in this over-litigated case. In particular, the Court finds and concludes that:

1. In return for valuable consideration, Lockheed and the United States agreed in 1979 that they would not contest their liability to pay compensatory damages to these infant plaintiffs. Stipulation of September 14, 1979. The sole issue remaining for trial, according to the Stipulation, was the extent of the damages, if any, incurred by the plaintiffs as a proximate result of the Saigon crash. *See Friends for all Children, Inc. v. Lockheed Aircraft Corp.,* 567 F.Supp. 790, 796 (D.D.C.1983).

■ 2. Through trials and settlements, each of the 52 American plaintiffs has recovered a substantial amount ranging from $125,000.00 to $1,000,000.00 with the average recovery exceeding $300,000.00.[3] Nevertheless, the *Schneider* decision apparently mandates that it is a genuinely disputed issue of material fact whether each particular foreign child has been injured and whether each such injury is a proximate result of the crash. *Schneider v. Lockheed Aircraft Corporation,* 658 F.2d 835 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). Plaintiffs presented examining physicians and experts who vigorously asserted that these foreign plaintiffs suffer a variety of neurological, psychomotor, speech, and attention disorders; that these injuries are a proximate result of the crash; and that treatment is urgently needed before the condition of the children deteriorates beyond repair. Defendant presented physicians and experts who just as vigorously asserted that the plaintiffs' own evidence shows that some of these children are perfectly normal; and that, although many do suffer disorders, these disorders

---

2. The result on these issues might be different if the Court was persuaded that triers of fact may be permitted to draw the adverse inference sought by plaintiffs.

3. Altogether, the American infant plaintiffs re-

were not proximately caused by the crash.[4] This factual dispute precludes any partial summary judgment that defendant is liable for the costs of interim medical or educational *treatment*.

3. Defendant's and plaintiffs' experts, as usual, agreed on very little. They did agree, however, that most if not all of these children should receive a comprehensive set of diagnostic examinations[5] to identify their maladies, if any, and to determine appropriate treatment. The experts also agreed that the examinations should be performed without delay if there is to be meaningful treatment for the ones who suffer disorders.[6]

4. It cannot be reasonably disputed that the need for some *diagnostic* examinations—for examinations to discover whether a particular child was or is injured and whether those injuries are proximately caused by the crash—is itself a proximate result of this particular crash. No such examination into these questions of causation would be necessary but for the fact that these children endured explosive decompression and hypoxia aboard a plane which subsequently crashed, and that after the crash they received relatively cursory, unspecialized examinations from the Air Force without any systematic follow-up by either defendant. Despite undisputed evidence in the record that the plane which crashed broke into many pieces and that many of its passengers were killed, including several who were riding in the troop compartment where most if not all of the foreign infants were seated, defendant argues that the plane probably made a soft landing which could not put all of the children at risk of neurological, psychological, or brain injury. Even accepting defendant's assertions, as the Court must on a motion for partial summary judgment, defendant has not argued that *no* diagnostic examinations of a child involved in such a crash is called for. Even Lockheed could

covered more than $17,000,000.00.

4. One of plaintiffs' experts, Dr. Herbert Cohen of the Albert Einstein School of Medicine, testified that of 54 children whose medical records he examined, 29 definitely have a neurological dysfunction, while he suspects nine more may have such a dysfunction. One of defendant's experts, Dr. Patricia Quinn of Georgetown University, testified that at least six and possibly eight of 53 children who were examined suffer from Minimal Brain Dysfunction; that at least one and possibly five of 53 children suffer from an attention deficit disorder; and that at least eight of the 53 children have language problems. (Tr. at 2101 *et seq.*).

5. Expert testimony establishes that proper diagnosis of at least a substantial number of these plaintiffs requires examinations and opinions by several specialists, e.g. a pediatrician, a pediatric neurologist, a psychiatrist, and a clinical psychologist. The Order entered February 23, 1984, contemplates appropriate adjustments in the event that it is later determined that one or more plaintiffs does not require such multidisciplinary services.

6. For example, defendant's expert developmental pediatrician Dr. Patricia Quinn, testified that:

These children should be examined by a competent physician who is able to say whether this child is having problems or not. I agree with that, yes.

(Tr. at 2121). She also testified that:

I have concerns as you're talking about the five years as regards to what happens to the child in those five years. I think that there's a potential that the parents may wait, and not do anything, for the trial to come up. And I have significant concerns about that.

(Tr. at 2136).

Plaintiffs' experts were even more emphatic on these points. Dr. Cohen testified that:

Q. Would you state your opinion with reasonable medical certainty as to the timing of the need for medical examination and intervention in these children, how important it is to do it now, or is it important [sic]?

A. Absolutely essential.

I was extremely upset and frustrated reading the reports. Many of these children have had long-standing problems. They should have had intervention a long time ago. And some of them—a good number of them—their problems could have been mitigated, sometimes voided, and certainly dealt with, if they had had earlier intervention.

(Tr. at 496).

So my feeling is quite strong that youngsters like this are at serious risk of getting into increasing difficulties, as are some of the adolescents and all the children in this group.

(Tr. at 497).

The prognosis becomes poorer, and the longer it goes unattended, the worse it will become.

(Tr. at 498).

not find a respectable expert to testify that there should be no medical examination whatsoever of a child following a crash under the circumstances it alleges. There has been no such testimony, and even if there were, it would be so inherently incredible as to be entitled to no weight.[7] Defendant may be arguing that the examinations already performed on these children—at the crash scene, at the Seventh Day Adventist Hospital in Saigon, at the Presidio in San Francisco, and in their countries of residence—exceed already what is called for by what defendant claims were the conditions of the crash. This claim is indeed in dispute and will be a question for the jury. For summary judgment purposes, it is enough, however, that it is not and cannot be disputed that the requirement for *reasonable* diagnostic examination of these children is a proximate result of the crash.

5. As defendant has stipulated that it is liable for compensatory damages proximately related to the crash, the plaintiffs are therefore entitled to a partial summary judgment that defendant is liable to each plaintiff for costs incurred in obtaining such diagnostic examinations as the trier of fact concludes were or are reasonable under the circumstances. What examinations each child required, and the reasonable costs of that child's diagnostic examinations, is contested by the parties and will be a jury question. This summary judgment is therefore rendered on liability alone and must remain interlocutory in character. Fed.R.Civ.P. 56(c).

6. Jury trials to determine the actual damages plaintiffs incurred, both for the diagnostic examinations and for such injuries, if any, that the jury finds that a particular child suffers due to the crash, are likely to take four to six weeks per child given experience with the American cases. Despite the Court's repeated efforts to promote settlement of these cases, defendant has not yet made a single settlement offer to any of the foreign plaintiffs. Resolution by trial of these cases is therefore likely to take six years or more.

■ 7. Plaintiffs' motion for a mandatory preliminary injunction requiring defendant to pay $8.7 million for diagnostic examinations, medical treatment, guardian's fees and attorneys' fees must for the most part be denied. Citing *Enercons Virginia Inc. v. American Security Bank*, 720 F.2d 28 (D.C.Cir.1983), defendant claims that a preliminary injunction in this type of tort case would be a *per se* abuse of discretion. Leaving aside the obvious differences between this litigation and *Enercons*,[8] it is nevertheless obvious from a review of the record that plaintiffs have not made an adequate showing that they are entitled to have defendant pay all their medical and legal bills prior to trial on the merits of their claims. *See Schneider, supra*, 658 F.2d at 852.

8. Plaintiffs are, however, entitled to a preliminary injunction mandating that defendant provide such reasonable *diagnostic* examinations to these children as they have not yet received and are not likely to receive in normal course before they have entered the critical years of adolescence. As explained below, this conclusion follows from the Court's findings that plaintiffs will suffer an irreparable injury that is inadequately remedied at law if such an injunction is not granted; that plaintiffs have made a strong showing that they are substantially likely to recover at least the cost of reasonable diagnostic examinations when these cases are tried on the merits; that the balance of hardships strongly fa-

---

7. Defendant has argued that many of the plaintiffs had pre-existing neurological deficits when they boarded the plane. Even assuming that to be the case, diagnostic examinations of those with such deficits remains necessary to determine which children had such pre-existing deficits and whether the crash aggravated such deficits. No one argues that the crash had a therapeutic effect on previously injured children.

8. *Enercons* involved a dispute over payment of a check. It involved money and nothing but money. This motion involves the health and future of allegedly injured infants. And unlike *Enercons*, defendant has stipulated that it is liable for compensatory damages proximately related to the crash.

vors granting such an injunction; and that the public interest favors such an injunction. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977).

### 9. *Irreparable Injury.*

Plaintiffs have convincingly demonstrated that, unless defendant provides thorough multidisciplinary diagnostic examinations soon, they will suffer irreparable injury in the years it will take before their cases can be tried. There was substantial expert testimony, some of it from defendant's own expert physicians, that many, if not all, of these children should be thoroughly examined immediately. The urgency arises from the fact that many of the alleged disorders they may have can be adequately treated and the disabling symptoms minimized only if identified early in life, and certainly before the onset of adolescence. Most of these children are now between nine and eleven years old. Any further delay in the provision of *diagnostic* examinations, whether it be due to further litigation or to the financial hardship of the plaintiffs, will be disasterous. Substantial and persuasive evidence was presented during the hearing that almost none of the foreign children has yet received the comprehensive set of diagnostic examinations appropriate under the circumstances. Defendant and plaintiffs' counsel blame each other for the lack of examinations to date, and there is certainly more than enough blame to go around.[9] The time for finger-pointing is at an end, however, and now is the time for action at least to preserve the *status quo* by identifying plaintiffs' current medical condition with a view to preventing further deterioration pending trials.

### 10. *Inadequate Legal Remedy.*

The "status quo" in this litigation is that defendant has stipulated that it is liable to plaintiffs for compensatory damages proximately related to the crash, and that each plaintiff is entitled as a matter of law to compensation for such diagnostic examinations as the trier of fact finds are reasonable under the circumstances of the crash. Most of these plaintiffs have not received and, in the absence of interlocutory relief, will not receive appropriate diagnostic examinations until their cases are tried, which in most cases will be several years from now after they have reached or passed their adolescent years. Money damages following trial on the merits are not an adequate legal remedy for that delay. *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir.1979), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), is distinguishable because here, unlike in *Jaffee*, (a) defendant has stipulated that it is liable for compensatory damages, (b) the Court has entered a partial summary judgment that defendant is liable for reasonable diagnostic examinations, and (c) the extreme delay inherent in the complexity of this unique litigation, the number of plaintiffs, and the litigation tactics of the defendant renders any ultimate award of damages inadequate to remedy the immediate needs of the plaintiffs. Under these circumstances, precedent in this Circuit is more on point than *Jaffee:*

> This is one of those distinctive cases referred to by Judge, later Chief Justice, Taft, in which "the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict irreparable injury." *Toledo RR v. Pennsylvania Co.*, 54 F. 730, 741 (CC Ohio 1893). Mandatory, not merely prohibitory, relief is required at this stage to prevent continuing injury to the plaintiffs, irreparable in nature.

*Cole v. Lynn*, 389 F.Supp. 99, 105 (D.D.C. 1975) (Gesell, J.).

### 11. *Substantial Likelihood of Success on the Merits.*

Plaintiffs have made a strong showing that they are likely to succeed in persuading triers of fact that this plane crash put the children on board at risk of neurological, psychological, or brain injury. This is

---

**9.** This will be the subject of more detailed findings of fact in the forthcoming memorandum.

not to say that they will necessarily convince the jury that each particular child is in fact injured. But plaintiffs have made a strong showing that defendant's theory of the crash—which is that there was a decompression followed by a "soft" landing in a rice paddy which could not possibly put plaintiffs at risk of neurological injury—is untenable. They have made a strong showing that there was an explosive decompression and a violent crash that put each child on the plane *at risk* of incurring neurological or psychological injuries. As defendant is liable as a matter of law for such diagnostic examinations as the trier of fact finds is reasonable under the circumstances, plaintiffs have therefore made a strong showing that, at a minimum, juries will find defendant liable for the costs of diagnostic examinations to determine whether the risk of neurological injury created by the crash has ripened into an actual injury in each child's case.

### 12. *Balance of Hardships.*

Any expense and inconvenience to defendant from a properly limited preliminary injunction providing diagnostic examinations to the plaintiffs is far outweighed in a balancing of the equities by the serious threat of harm to the plaintiffs. Defendant argues that it may not be able to recover monies expended on particular plaintiffs after a jury trial should a verdict be rendered for the defendant. The Court has taken this argument into account in denying plaintiffs' motion for a preliminary injunction awarding them reimbursement for interim fees, medical *treatment*, and educational *treatment*. Yet plaintiffs have made a much stronger showing that they will succeed in recovering the costs of *diagnostic* examinations, and that the immediate receipt of those examinations is a prerequisite to meaningful treatment for their injuries, if any. It also is possible that the performance of diagnostic examinations now, with the expenses carefully monitored by the Court, will cost defendant significantly *less* in the long run than what juries might award to compensate for unmonitored examinations by the plaintiffs far in

the future. Prompt, thorough diagnostic examinations may identify disorders that can be treated and minimized now (*pendente lite*, the *treatment* will not originally be at defendant's expense). If such examinations are delayed and an ailment is later discovered and determined to be a proximate result of the crash, defendant might end up paying far more in damages, both for treatment and the consequences of the long delay in provision of it.

### 13. *The Public Interest.*

The public interest clearly favors a preliminary injunction. By assuring that these diagnostic examinations are performed now, the injunction may minimize the burden these plaintiffs impose on the health care systems of the countries in which they live. The diagnostic examinations may also have a beneficial side-effect on this protracted litigation: they may finally produce the sort of hard data on the medical condition of these children that defendant purports to require before it will even consider settlement of these cases. These cases have imposed a considerable strain on the resources of this Court. For example, it is not uncommon for a discovery dispute in these cases to consume thousands of pages of briefs, memoranda and exhibits, numerous motions, and many hours of the Court's limited time. Such disputes, if isolated, would be manageable. They arise, however, virtually every week. At a time when the Chief Justice of the United States publicly protests the excessive costs of litigation, it is clear that diagnostic examinations that could facilitate settlement of these cases would serve the public interest in containing the time and expense consumed in this kind of overlitigated dispute.

14. In making these findings, the Court has been fully mindful of the mandate of *Schneider, supra,* 658 F.2d at 852, that each child's circumstances are unique and should be separately assessed. Stretched to its limit, this principle might require this Court to review medical records and testimony on each child individually in 70 sepa-

rate hearings to decide what, if any, further diagnostic examinations are appropriate for each child. But the delay inherent in that process would effectively deny plaintiffs the relief they seek: prompt diagnostic examinations while effective treatment is still possible. The Court has already held three weeks of hearings and reviewed medical records on almost every child. Even more than previously, *see Friends for All Children v. Lockheed Aircraft Corporation*, 87 F.R.D. 560 (D.D.C. 1980), the evidence shows that every one of these children is at risk of neurological injuries and other disorders due to exposure to the conditions of the crash. Nevertheless, in accordance with the individualized attention mandated by *Schneider*, the preliminary injunction establishes a procedure whereby a panel of experts is to decide what further tests, if any, are suggested for each particular child. The tests given each child will vary according to the symptoms observed and the medical records on the child that are already available. The defendant will have an opportunity to argue briefly in writing that the record does not make a strong showing that the particular plaintiff is likely to succeed in persuading the trier of fact that defendant should pay the cost of that particular examination. The funds to pay for the examinations will be held by the Clerk of Court in interest bearing accounts or securities. Defendant will also be entitled to request that plaintiffs post a bond prior to payment from the Registry for the particular expenses to which it has a particular *bona fide* objection. The Court will rule promptly on each objection. As ordered, unexpended funds should revert to defendant with interest unless plaintiffs show good cause why the unexpended funds should not revert.

15. Plaintiffs' counsel are not entitled, prior to trial on the merits, to attorneys' or guardian's fees from the defendant for their work on these motions. More than 90% of the relief they sought has so far been denied. Plaintiffs contend that the conduct of defendant in defending against plaintiffs' motion was in bad faith, and constituted vexatious, wanton, or oppressive conduct within the meaning of *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). However, jurisdiction in these cases is by diversity, *see Alyeska, supra,* 421 U.S. at 259 n. 31, 95 S.Ct. at 1622, and the law of the District of Columbia does not now appear to permit an award of attorneys' fees even under the extreme circumstances alleged here. *See* 15 D.C.Code § 701(a).

16. In assessing the likelihood of plaintiffs' success on the merits, the Court has given no weight to plaintiffs' contention that they will be able at trial to ask finders of fact to draw inferences adverse to the defendant from the destruction of relevant evidence.[10] That contention was entitled to no weight given the following conclusions of the Court that underlie its February 23, 1984, ruling on the adverse inference issue in *Maupoint.*

17. The condition of the interior of the troop compartment and its passengers following the crash will be a critically disputed issue of fact in the foreign infant cases. In earlier trials, plaintiffs have argued that the troop compartment was subjected to several severe jolts of great force and that fire and smoke were in the troop compartment during and after the crash. Lockheed and the United States maintained, to the contrary, that the troop compartment slid to a gentle landing and that relatively mild forces were felt by its occupants. Since most, if not all, of the foreign infants were passengers in the troop compartment, it is inevitable that this same dispute will arise in the foreign cases.

18. Evidence of damage to the interior of and fixtures in the troop compartment or of traumatic injury to the passengers inside it would tend to support plaintiffs' theory of the crash. Evidence that the interior and its fixtures were relatively undamaged or that passengers were unscathed would tend to support defendant's

**10.** Such an inference could have dramatically affected the result.

"soft landing" theory. Plaintiffs allege, however, that after-crash photographs of the interior of the troop compartment and the condition of the seats and other fixtures as well as autopsies of the child or children who died in the troop compartment have been destroyed. Citing *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329 (D.C.Cir.1972), plaintiffs argue that they are entitled to attempt to persuade juries to draw inferences adverse to defendant from this destruction of evidence.

19. As the Court has previously noted, *see* Memorandum of January 31, 1984, the 1982 Stipulation of Compromise Settlement approved by the parties does not bar application of the evidentiary principle known as the adverse inference rule. Defendant's February 8, 1984 Motion for Reconsideration of the January 31, 1984 Memorandum must be denied.

■ 20. Before a jury may be permitted to draw an inference adverse to the defendant, plaintiffs must establish, at a minimum, that relevant evidence existed, that it was within the ability of the defendant to produce it, and that it has not been produced due to the actions of the defendant. If the defendant in this litigation were the United States, plaintiffs would have succeeded in carrying this burden. The Court finds from the testimony at the hearing and the entire record (a) that numerous photographs of the interior of the troop compartment were taken during the United States Air Force investigation of the crash; (b) that these photographs were the subject of discovery requests from the plaintiffs as early as 1975; (c) that Air Force Regulations required Air Force personnel to preserve this kind of evidence, and make it accessible to persons allegedly injured in the crash without any limiting privilege claim; (d) that many of these photographs along with voluminous other evidence were intentionally destroyed by the Air Force in 1977 or 1978; (e) that an attorney for the United States (who was present in December 1975 when Lockheed's counsel represented to the late Chief Judge

William B. Jones that to his knowledge all documents had been preserved)[11] learned of this destruction by May 1978 at the latest, appeared frequently before the Court thereafter, and nevertheless failed to inform the Court or the plaintiffs of this destruction until 1980; and (f) that, although copies of some of the destroyed photographs were later discovered and produced, other photographs, including some photographs of the interior of the troop compartment, still have not and can never be produced.

■ But however questionable its conduct, the United States is not the defendant in this litigation. Even if it was, the jury hearing the case against Lockheed would not be privileged to draw any adverse inference against that defendant because of the Air Force's misconduct. Plaintiffs have a more difficult burden in establishing the prerequisites of an adverse inference against Lockheed.

21. Plaintiffs have not adequately shown that autopsies of the infant or infants who died in the troop compartment were ever conducted, or that autopsy reports were prepared, or that those reports could ever have been produced by Lockheed.

22. Plaintiffs have adequately shown that photographs of the interior of the troop compartment existed that have not as yet been produced. In addition, they have shown that many, although not all, of such troop compartment photographs were taken by Lockheed employees who participated in the accident investigation. These photographs, as well as the photographs taken by Air Force participants in the accident investigation, were known to Lockheed through its close involvement in the accident investigation. Photographs taken by Lockheed employees were returned to the Air Force at the conclusion of the investigation. Lockheed and the United States cooperated throughout the investigation and have worked together through much of the defense of this litigation.

---

11. *See* p. 21, *infra.*

23. Plaintiffs have also convincingly demonstrated that, but for the action and inaction of Lockheed and its counsel, the missing photographs of the interior of the troop compartment would have been produced. Most significantly, on December 18, 1975, plaintiffs' counsel formally requested that Chief Judge Jones enter a protective order that would have preserved the photographs. In opposing the issuance of a protective order, Carroll Dubuc, counsel for Lockheed, represented to Chief Judge Jones that

> any relevant documents known to [Lockheed] have been preserved . . . .

(Tr. 12/18/75 at p. 83). Chief Judge Jones thereupon denied the motion for a protective order. There is abundant evidence in the record of cooperation between Lockheed and the Air Force from which to infer that, if, after Chief Judge Jones denied the motion in reliance on Lockheed's representation, Lockheed had requested the Air Force to preserve the photographs, the Air Force could and would have done so. Lockheed's attorney-client, work-product and "executive privilege" claims, of dubious merit, also contributed to the delay in production of the relevant photographs and the delay in discovering that relevant evidence had been destroyed.

24. It is therefore clear that relevant evidence existed which had not been produced, that Lockheed could have taken actions to preserve this evidence after its representation to Chief Judge Jones, and that, but for Lockheed's failure to take action, the relevant evidence would not have been destroyed. Were it up to this Court alone to create a standard for this Circuit, Lockheed might be held to a strict fiduciary obligation to make good on its representation to Chief Judge Jones and might be held subject to an adverse inference for the breach of the fiduciary obligation that it there assumed. Or Lockheed's representation to Chief Judge Jones might be held to estop it from later denying or equivocating about its control of the documents. Defendant has argued, however, that the evidence must show bad faith or evil intent on its part in the actual destruc-

tion of the photographs before an adverse inference instruction to the jury is appropriate. Defendant cites *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir.1975), in support of this argument. Although it is unclear whether the bad faith standard announced in *Vick* has been or would be adopted in this Circuit, *Vick* is the existing authority and should be followed unless and until our Court of Appeals indicates a contrary intent.

◼ 25. Plaintiffs have adduced considerable probative evidence in the form of documents and live testimony by hostile Lockheed officials that Lockheed deliberately limited the records which it made and retained about the crash, that it made dubious privilege claims to delay discovery, and that it quickly shipped to the Air Force photographs and other discoverable evidence that it had with the expectation that the Air Force would further shield them by privilege claims. In doing so, Lockheed failed to take any precautions to assure that the evidence would be preserved. Nevertheless, the evidence is equivocal on the issue of whether Lockheed officials possessed evil intent or bad faith concerning the actual destruction of evidence by the Air Force. For that reason, the bad faith standard of *Vick, supra,* is not satisfied. Plaintiff Maupoint will therefore be precluded from introducing evidence concerning the destruction of evidence at her trial and from attempting to persuade a jury to draw an inference adverse to the defendant from that destruction. This ruling and the findings upon which it is based apply only to this recently completed phase of the preliminary injunction hearing and to the *Maupoint* case. These findings are not intended to apply to the cases of other foreign infant plaintiffs.

26. There is a second ground for precluding application of the adverse inference rule under these circumstances. The Court had hoped that, if adverse inference claims were to be raised before a jury, the testimony, affidavits, and exhibits offered into evidence could be strictly contained within

the narrow framework envisioned by the pretrial orders in *Kurth II. See Kurth v. Lockheed Aircraft Corporation*, No. 80–3223, Orders of February 1, 1983; July 1, 1983; and September 7, 1983. The *Kurth* orders contemplated that adverse inferences might be drawn simply from proof of the original existence and destruction of photographs and of the fact that defendant had some responsibility for such items of evidence while engaged in or anticipating litigation about the crash. So constrained, the evidence concerning an adverse inference would have been more probative than prejudicial. The recent hearing indicates that if the plaintiffs have the burden of proving bad faith on the part of defendant, the focus of trial is likely to be distorted by lengthy and inflammatory testimony about the propriety of Lockheed's conduct not only in this litigation, but also in activities ranging from bribery of foreign officials to destruction of computer data on U.S. Congressmen. As the Court originally concluded before the first *Kurth* trial, the litigation before a jury of the issue of whether Lockheed acted in bad faith in such circumstances would be more prejudicial than probative and would be likely to divert the jury's attention from the central issues in the case. Thus, if plaintiffs must prove defendant's bad faith before they can present the adverse inference issue to the jury, the risk of distortion of the trial precludes plaintiffs' opportunity to raise the adverse inference issue in the *Maupoint* trial.

■ 27. It would be improper as a matter of District of Columbia law for juries in the foreign infant cases to consider collateral sources of payments for medical services such as the foreign social insurance programs or nationalized health systems. Plaintiffs' argument that the Court's ruling of June 18, 1980, is the law of the case on this issue is persuasive. Even assuming that were not the case, it is clear that, under the interest analysis approach to choice of laws applied in the District of Columbia, *see, e.g., Williams v. Williams*, 390 A.2d 4, 5–6 (1978), foreign jurisdictions have no interest in applying their law to damages issues if it would result in less protection to their nationals in a suit against a United States corporation. *See In Re Paris Air Crash of March 3, 1974*, 399 F.Supp. 732, 745 (C.D.Cal.1975); *In Re Air Crash Disaster at Mannheim, Germany on September 11, 1982*, 575 F.Supp. 521, at 525–526 (E.D.Pa.1983). The United States and the District of Columbia have a significant interest in applying their law. *Cf. Friends for All Children, Inc. v. Lockheed Aircraft Corporation*, 717 F.2d 602, 609–10 (D.C.Cir.1983). The applicable law in this diversity litigation is therefore the law of the District of Columbia. Defendants have offered no plausible support for their argument that the District of Columbia would apply its collateral source rule to exclude consideration of payments by an American social insurance program while at the same time permitting consideration of payments by foreign social insurance programs. It is much more plausible to believe that the District of Columbia would follow the one relevant American case on point, *Chapman v. Brown*, 198 F.Supp. 78 (D.Hawaii 1961) (collateral source rule bars consideration of medical expense reimbursement by public agency of a Canadian province), *aff'd sub nom. Brown v. Chapman*, 304 F.2d 149 (9th Cir.1962), and exclude consideration of payments from foreign governmental insurance programs. The rule in *Chapman* will therefore be followed in the *Maupoint* case.

28. Should plaintiffs appeal the denial of a preliminary injunction for medical treatment, educational services, and guardian's fees, or should defendant appeal the granting of a preliminary injunction for diagnostic examinations, the Court will consider certifying the foregoing rulings on adverse inference and collateral source for review by the Court of Appeals simultaneously with review of the preliminary injunction. 28 U.S.C. § 1292(b).

29. Plaintiff Maupoint's February 22, 1984, motion to amend her complaint must be granted because, assuming the truth of the facts alleged in her supporting memorandum, justice would require that she be

granted leave to amend even at this late date. Fed.R.Civ.P. 15(a). Plaintiff's new claims are not invalid on their face, and there is some evidence in the record, including evidence produced for the first time on March 5, 1984, which may support plaintiff's fraud and breach of contract claims. It is impossible for the Court to resolve all the complex issues raised by defendant's opposition to plaintiff's motion now; these arguments are best briefed, and addressed, in the context of a motion to dismiss or a motion for summary judgment. To prevent any prejudice to the parties, whose counsel are now preparing for trial commencing April 3, 1984 on plaintiff Maupoint's previous tort claims, the February 23, 1984, order stayed all discovery, pretrial, and trial proceedings on plaintiff Maupoint's new claims until after trial on the merits of her previous tort claims.

## ON PARTIAL SUMMARY JUDGMENT

These findings and conclusions supplement, and are summarized in, the findings and conclusions in the Memorandum of March 16, 1984, which is attached as an exhibit. They should be read in conjunction with that memorandum. Together, these two documents support the Court's rulings of February 23, 1984, on plaintiffs' motions for a partial summary judgment and a preliminary injunction in the cases of Vietnamese orphans who were passengers on a C–5A cargo aircraft that crashed on April 4, 1975, and who were adopted by parents in Canada and Europe.[1]

In addition, the Court is preparing detailed supplemental findings of fact and conclusions of law supporting its February 23, 1984, rulings on the adverse inference and collateral source issues in No. 76–0455–68. After considering the exigency of plaintiffs' circumstances and the prejudice inherent in any further delay, the Court has decided to issue the supplemental findings and conclusions with respect to the summary judgment and preliminary injunction motions immediately, and to re-enter a properly modified version of the February 23, 1984 Order in No. 76–0544 without delay. As noted below, the Court has already considered whether the provisions of today's Order should be stayed pending appellate review, and concluded that such a stay would be especially inappropriate in the circumstances.

## I. SUPPLEMENTAL FINDINGS OF FACT

1. On April 4, 1975, a C–5A military transport airplane, designed and built by the Lockheed Aircraft Corporation and operated by the United States Air Force, crashed near Saigon, South Vietnam. Among the passengers were more than 200 Vietnamese orphans who were being taken to the United States, Canada, and Europe for adoption. One hundred and fifty of the children survived the crash. More than seventy now reside in Canada and Europe; the majority of these live in France.

2. In 1975, Friends for All Children, a non-profit organization which then had custody of the infant survivors, brought this litigation seeking compensatory and punitive damages on behalf of these 150 children. The adoptive parents of each child have been subsequently substituted as that plaintiff's legal representative. A guardian *ad litem* for all the plaintiffs was appointed in 1979. The guardian and the plaintiffs allege that these children have incurred a variety of physical, neurological,

---

**1.** The February 23, 1984 Order in No. 76–0544 was vacated on March 22, 1984, pending the filing of these supplemental findings and conclusions. An accompanying order re-enters, with some modifications, the provisions of the February 23, 1984 Order in No. 76–0544.

Meanwhile, on April 2, 1984, plaintiffs and the guardian *ad litem* filed a motion for reconsideration and requested a hearing on that motion. The accompanying Order treats that mo-

tion as one for leave to supplement the record in the preliminary injunction proceeding and for further relief. The Order sets that motion down for hearing after defendant has had an opportunity to respond, the jury has reached a verdict in *Maupoint*, and the parties have acted on the Court's request that they develop a plan for settlement of some, or all, of the pending foreign infant cases.

and psychological injuries as a proximate result of the crash.

3. On September 14, 1979, after the guardian *ad litem* was in place and extensive discovery on the issue of liability was completed, the defendant entered into two agreements with plaintiffs and the guardian. The provisions included the following:

(a) Lockheed agreed not to contest its liability for compensatory damages; instead, the issue remaining for determination was to be only the amount, if any, to be awarded as compensatory damages to each infant for injuries arising out of the accident;

(b) Plaintiffs dismissed their claims for punitive damages;

(c) Lockheed agreed to pay $5,000 to the guardian *ad litem* for the litigation and medical expenses of each child who filed an amended complaint.

4. Although the stated purpose of the 1979 agreements was "to accomplish the fair and expeditious compensation of those parties injured, without reference to fault or responsibility," the litigation has been prolonged and delayed. The Court conducted three bellwether trials in the Spring of 1980, each of which ultimately resulted in a jury verdict for an individual American plaintiff. It was hoped that these trials, involving typical plaintiffs, would provide all parties the necessary information to settle all the remaining cases. Even after these verdicts, however, the parties were unable to negotiate settlements of any of the other children's cases. At that point, it became apparent that there would be a significant delay before the cases could be resolved, and that plaintiffs were unlikely to receive any medical assistance in the interim.[2] The $5,000 payments had long since been pooled for the benefit of all the plaintiffs and expended primarily in preparation of medical evidence for, and in prosecution of, the bellwether cases, on the reasonable assumption that settlement of the

other cases would promptly follow, or that the evidence would be available to all the plaintiffs whose cases went to trial.

5. On June 9, 1980, plaintiffs filed three motions seeking interim medical and educational attention for the children. The first motion sought a partial summary judgment that the defendant was liable for the cost of medical and psychological examinations for the infant plaintiffs. The second and third motions sought a mandatory preliminary injunction requiring the defendant to pay the cost of medical examinations and medical and educational treatment pending the outcome of trials on the merits. The Court conducted four days of hearings on these motions in June and July, 1980. Before a ruling could be issued, the parties reached a comprehensive agreement under which the infant plaintiffs would be provided with funds for diagnostic examinations, medical treatment, and educational services pending trials. The agreement held out the promise that, however complex and delayed the subsequent legal proceedings, the infant plaintiffs would be treated in the interim. The agreement was signed by representatives of Lockheed, its insurance carrier, and all trial counsel, and submitted to the Department of Justice for final approval.

6. On June 13, 1980, Lockheed moved to dismiss the cases of infant plaintiffs who had been adopted by parents outside the United States on the ground that the District of Columbia was not a convenient forum. The Court denied the motion on June 19, 1980, and subsequently denied defendant's motion for certification of the question.

7. During the summer and early fall of 1980, the Court, assisted by counsel, developed a comprehensive pretrial order providing a form of collateral estoppel built upon the experience of the bellwether trials, attempted to complete pretrial of the cases involving infants adopted by American par-

---

**2.** The medical evidence prepared for the bellwether cases included medical examinations of a score or more of the plaintiffs and was usable in the trial or settlement of all the cases, includ-

ing those of the foreign plaintiffs. Considerable other evidence prepared for the bellwether cases was usable in subsequent trials.

ents, and arranged for distribution of the American cases among all the judges of this Court for trial on an expedited basis in accordance with the comprehensive pretrial order. The comprehensive pretrial order was filed on October 30, 1980.[3] In accordance with the *en banc* order of the Court, preparations were made for the judges to try the cases in rapid sequence commencing in early 1981.

8. In late 1980 and early 1981, after long delays, policy-level officials in the Department of Justice vetoed the agreement providing interim medical and educational services to the infant plaintiffs. Expeditious resolution of these cases once again became critical.

9. On November 20, 1980, the Court invited further briefing on the *forum non conveniens* issue in light of a decision of the Court of Appeals the previous week in *Pain v. United Technologies Corporation*, 637 F.2d 775 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). After reviewing that decision, Lockheed filed a renewed motion to dismiss the cases of the foreign infants on the ground that the District of Columbia was an inconvenient forum. After significant delay, the United States joined that motion on May 15, 1981, with a supporting memorandum. In the meantime, five cases involving the claims of American infants were tried to juries with verdicts for the plaintiffs and several cases were settled on the eve of trial. Verdicts and settlements ranged between $37,000 and $1,000,000.

10. On May 19, 1981, the Court of Appeals set aside the verdicts in the bellwether cases and disapproved of collateral estoppel as a means of streamlining the remaining trials, but left to this Court the ultimate decision about limiting photographic evidence. *Schneider v. Lockheed Aircraft Corporation*, 658 F.2d 835 (D.C.

Cir.1981), *cert. denied*, 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). The Court of Appeals noted that

Although this opinion will, in practical terms, require the retrial of several cases, it is our hope that the setting forth of our views on many of these cases will speed these cases to swift and proper resolution.

658 F.2d at 857.

11. To speed these cases to swift and proper resolution, the District Court *en banc* scheduled the remaining cases involving American infants for trial one per month beginning January 1, 1982. Shortly thereafter, this Court denied Lockheed and the United States' renewed motion to dismiss the claims of the foreign infant plaintiffs.

12. In litigating the cases of infants adopted by American parents, plaintiffs attorneys advanced about $4,000,000 for the expenses and for their services rendered between 1975 and 1982. Guardian's fees and expenses exceeded $700,000. *See Friends for All Children, Inc. v. Lockheed Aircraft Corporation*, 567 F.Supp. 790, 818–22 (D.D.C.1983). In litigating the foreign infant cases, plaintiffs attorneys and the guardian have already advanced more than $240,000 for expenses alone.

13. During all the negotiations and trials up through 1981, the Court and counsel were handicapped by a paucity of photographs of the crash scene. Only a handful of pictures had been produced by the United States, and much time was spent arguing the validity and admissibility of artist's drawings submitted by each party. In the wake of the *Schneider* decision, photographs of the crash scene assumed greater importance in determining the impact of the crash upon the infant plaintiffs. Plaintiffs resumed their previous discovery efforts in the summer and fall of 1981. Al-

---

**3.** It provided that, in light of the verdicts and experience of the bellwether trials, defendant was precluded from attempting to prove that the trauma of the crash was insufficient to cause any brain damage proved by a plaintiff and that defendant had the burden of proving that pre-existing conditions caused any such damage.

The pretrial order, entered by the Court before exposure of the document destruction (*see* paragraph 13 *infra*), also limited the photographs of the crash scene usable by plaintiffs on the ground that those offered were, in light of the preclusion ruling more prejudicial than probative, and provided only tangential evidence.

though charged by the defendants with "harrassment," plaintiffs persevered and were rewarded with the discovery of 1000 photographs of the crash scene and wreckage that had been requested at the outset of discovery in 1975 and 1976 but had never been produced. Subsequent discovery yielded slides, videotapes, documents, and more photographs that had never previously been produced. On October 28, 1981, plaintiffs filed a motion for discovery sanctions under Rule 37 of the Federal Rules of Civil Procedure. They supplemented that motion during late 1981 and early 1982 as discovery on the sanctions issue unearthed further photographs and documents which the United States had previously represented to be nonexistent. There were lengthy hearings on the sanctions motion in March, 1982, and the motion was taken under advisement. It became apparent during the hearings that significant evidence, including "tons of photographs," was destroyed by the Air Force as late as 1977 and 1978. A ruling on the motion was deferred, however, and several trials were continued, on assurance from the parties that a comprehensive settlement was imminent. Finally, trial counsel signed a Stipulation of Compromise Settlement on August 4, 1982. It was approved by the Deputy Attorney General on August 24, 1982, and by this Court on August 28, 1982. Under the stipulation, Lockheed and the United States agreed to pay $13.5 million dollars in settlement of the claims of 45 American infant plaintiffs. As a result of this settlement and the settlement of other American cases, the American infants have recovered more than $17 million. Every infant adopted by American parents has now received a substantial amount for his or her claim, with the average recovery exceeding $300,000.

14. Although the claims of the foreign infant plaintiffs were not completely resolved by the August 1982 settlement, these plaintiffs were parties to the agreement. The Court approved the settlement in express reliance on the representation of the guardian and counsel that it would promote prompt attention to the claims of the foreign infants.

15. In April, 1982, when the sanctions motion was under advisement, it appeared that settlement of the foreign cases would not occur prior to appellate resolution of the *forum non conveniens* issue, and that there was substantial ground for difference of opinion on this issue. Accordingly, on motion by the defendant, the Court certified its rulings denying defendant's motions to dismiss for appellate review pursuant to 28 U.S.C. § 1292(b) on April 2, 1982. On September 9, 1982, the Court filed a written request to the Court of Appeals that the appeal of the *forum non conveniens* issues be heard on an expedited basis in light of the urgent circumstances.

16. On September 9, 1983, seventeen months after this Court certified the issue, the Court of Appeals affirmed this Court's *forum non conveniens* ruling. *Friends for All Children v. Lockheed Aircraft Corporation,* 717 F.2d 602 (D.C.Cir.1983).

17. Thereupon, on September 21, 1983, a status conference was held to discuss scheduling of further proceedings in the foreign infant cases. Alleging that the foreign infants required immediate medical attention, plaintiffs sought expedited trials, or, in the alternative, preliminary relief. Lockheed and the United States represented that they would require four categories of medical and educational records on the foreign infants before they could make an initial assessment of these cases for settlement purposes. For reasons described at length in the Memorandum and Order of November 28, 1983, the Court ordered the plaintiffs to produce the categories of documents requested by the defendant and scheduled a hearing on plaintiff's renewed motions for summary judgment and a preliminary injunction to commence on January 9, 1984. The first of the foreign infant cases was also set for trial to commence the first week of April, 1984.

18. On December 2, 1983, plaintiffs produced more than 12,000 pages of medical and educational records on the foreign infant plaintiffs to the defendant. The documents included the reports of doctors who

had conducted "screening" medical examinations of more than 50 foreign infant plaintiffs. Despite considerable efforts to promote settlement, *see, e.g.,* Memorandum and Order of January 4, 1984, not a single foreign infant case has been settled, and defendant has yet to respond to plaintiffs' demand or to make an offer, or counteroffer, in any of these cases.[4]

19. After exhaustive briefing, more than three weeks of hearings on plaintiffs' renewed motions were held in January and February, 1984. During the hearings, more than twenty witnesses, including adoptive parents, medical experts from both Europe and the United States, and Lockheed and Air Force officials testified. Hundreds of exhibits were considered and admitted into evidence. The Court also heard extensive testimony and argument on the issue of whether plaintiffs should be permitted to ask triers of fact to draw inferences adverse to the defendant from the destruction of evidence which was uncovered in 1980 and 1981. This issue, along with the question of whether the District of Columbia's collateral source rule applies to the cases of the foreign infants, also became ripe for decision in *Maupoint v. Lockheed Aircraft Corporation,* C.A. No. 76–0544–68, a few weeks after the hearing. The *Maupoint* trial commenced on April 3, 1984.

20. The Court has recently dismissed the claims of three foreign infant plaintiffs, Order of December 20, 1983, and permitted eight foreign infant plaintiffs to file amended complaints. In accordance with the stipulation of 1979, defendant paid $5,000 to the guardian *ad litem* for the litigation and medical expenses of each of these eight plaintiffs on March 19, 1984. These eight plaintiffs—D. Bellard, V. Bellard, S. Blank, M. Fressange, S. Josefsson, D. Nicot, P. Olliges, and D. Picavet—consequently have access to funds for medical treatment that the remaining foreign infants do not enjoy. Five of these children reside in France.

21. Plaintiffs sought the following relief in their renewed motions:

(a) A partial summary judgment that defendant is liable for the costs of medical examinations, medical treatment, and educational expenses incurred by the foreign infant plaintiffs prior to their trial;

(b) A mandatory preliminary injunction requiring defendant to provide medical examinations, medical treatment, and educational assistance to the foreign infant plaintiffs prior to their trials;

(c) Fees generated by the guardian *ad litem* in seeking such relief;

(d) Attorneys' fees generated by plaintiffs' counsel in seeking such relief.

22. For purposes of the hearing on plaintiffs' motions for a preliminary injunction and partial summary judgment, it is not contested that the foreign infant plaintiffs were aboard the C–5A that crashed near Saigon, South Vietnam on April 4, 1975. Tr. at 39–40 (Statement of Mr. Dubuc); Agreement of January 4, 1980.

23. It is not disputed that defendant Lockheed Aircraft Corporation has agreed not to contest its liability for compensatory damages to these plaintiffs for injuries proximately caused by the crash. Stipulation of September 14, 1979; Defendant's Proposed Finding of Fact No. 57.

24. It is not disputed that the foreign infant plaintiffs, who were under the care of Friends for All Children, Inc., boarded the C–5A in Saigon. Most if not all were strapped two to a rearward facing seat in the aft troop compartment. The others were placed in the cargo compartment.

25. It is not disputed that the aircraft took off; ascended for approximately fifteen minutes; and while climbing at an altitude of greater than 23,000 feet, experienced an explosive decompression when the aft cargo door broke off the aircraft.

---

**4.** *See* Order filed April 3, 1984, requesting on behalf of the judges of this Court that counsel initiate serious settlement efforts forthwith.

26. It is not disputed that the foreign infant plaintiffs on the plane were without oxygen for some period of time, although the parties vigorously dispute the length of that period, the medical significance of that period, and whether and to what extent infants in the aft troop compartment received oxygen from overhead masks during that period.

27. It is not disputed that the aircraft promptly turned back for Saigon and began to descend. Nor is it disputed that the aircraft hit the ground several miles short of the airport runway, skidded for approximately 1000 feet, became airborne again, crossed the Saigon river, hit the ground again, skidded again, and broke and tore into many pieces. The wing section exploded and burned. It is not disputed that the air speed at the moment of impact was substantially greater than the normal landing speed.

28. It is not disputed that the crash killed more than one hundred of the passengers, including almost all of the occupants of the cargo compartment and some of the adults and at least one of the children in the troop compartment. Survivors were quickly evacuated from the scene to hospitals in Saigon; the foreign infant plaintiffs left Saigon for the United States shortly thereafter and were eventually delivered to their adoptive parents in Canada and Europe.

29. It is vigorously disputed by the parties whether most of the foreign infant plaintiffs have any neurological, psychological, physical, or psychomotor injuries, whether the combination of circumstances involved in the crash could cause such injuries, and whether the crash did in fact cause such injuries. The Court has reviewed affidavits and testimony from experts that are in direct conflict on all three of these points.

30. Although it has now been nine years since the crash put these foreign infant plaintiffs at risk of serious injury, many of the foreign infant plaintiffs have still not received comprehensive diagnostic examinations to identify what, if any, neu-

rological, psychomotor, psychological, or physical injuries they received due to the crash. Tr. at 604 (Testimony of Dr. Conners); Tr. 725 (Testimony of Dr. Ma); Tr. at 1782–84 (Testimony of Dr. Dugas). It appears from the medical records in evidence and the testimony that the only diagnostic examinations many of these children received prior to 1983 were unspecialized, superficial and cursory inspections in a hangar building at an Air Force facility in San Francisco immediately following the evacuation from Vietnam. Tr. at 1176–78 (Testimony of A. McCrudden). The reasons for the perplexing delay in the provision of comprehensive diagnostic examinations are manifold. They include:

(a) *The litigation tactics of Lockheed and the United States.* The United States vetoed, after a six-month delay, an agreement that would have provided these examinations in 1980. And both Lockheed and the United States have mounted a defense of attrition involving exhaustive discovery, hundreds of motions, and lengthy trials that delay resolution on merits and impose substantial costs on counsel for plaintiffs.

(b) *The decision of the guardian ad litem to expend the $5,000 payments in 1979 on trying the bellwether cases.* Had this money instead been devoted to diagnostic examinations for the foreign children, few diagnostic examinations would now be required. At the time these expenditures were made however, settlements were expected to follow promptly that would afford the foreign children complete relief for their medical and educational needs, if any. *See* paragraph 4, *supra.* The expenditures were also made necessary in large part by the litigation tactics of the defendant.

(c) *The failure of the European adoptive parents to obtain diagnostic examinations on their own.* From testimony at the hearing, it is apparent that this is due in part to the difficulties in recognizing symptoms, to difficulties in discovering how and where to obtain appropriate medical assistance, to difficulties in obtaining and paying for such assistance, and to ex-

pectations that this litigation would suggest and provide appropriate relief.

(d) *Toleration of delay by the Courts.* Finally, this Court, relying on assurances that settlements had been made, or were imminent, or would promptly follow bellwether trials, expedited appeals, stipulations, or production of particular medical records, tolerated the delay. Each trial and appeal took longer than expected, however, and the stipulations and document production still have not resulted in settlement.

31. In 1983, without prior notice to the Court or opposing counsel, the guardian *ad litem* did conduct "screening" examinations of many of the foreign infant plaintiffs in France. Most of these children were examined by a pediatrician and a psychologist. They were not, however, examined by neurologists or psychiatrists, nor did they receive the full array of neurological testing that would normally be done on children manifesting symptoms of minimal brain dysfunction. Nevertheless, based on the medical and school data produced by the plaintiffs on December 2, 1983, and the reports of the "screening" examinations, both plaintiffs' and defendant's experts testified that many of these children have serious injuries and other defects. Dr. Herbert Cohen of the Albert Einstein School of Medicine testified that 29 of the 54 children whose records he examined definitely have a neurological dysfunction, while at least nine more may have such a dysfunction. Defendant's expert developmental pediatrician, Dr. Patricia Quinn of Georgetown University, testified that at least six and possibly eight of the children whose records she examined suffer from minimal brain dysfunction; at least one and possibly five suffer from an attention deficit disorder; and at least eight have language problems. (Tr. at 2101 *et seq.*). Other symptoms observed included hyperactivity and speech and hearing difficulties. Defendant's experts stated that further testing would be required before a reliable diagnosis would be possible in many cases, but that the records indicate that at least twenty of the infants are completely normal.

32. The testimony and affidavits of defendant's and plaintiffs' experts and the entire record establish that the condition and experience of the foreign infants is such that each should receive diagnostic examinations to identify the injuries and disorders, if any, they have and to permit proper treatment of those who have disorders to commence. Even the defendant's expert, Dr. Quinn, testified that these children should be examined by a competent physician and that such examinations should not be unduly delayed. Tr. at 2121 and 2136. The particular examinations required vary according to the symptoms observed in each particular child, and it may well be that many of the foreign infant plaintiffs will need no further examination once a team of experts from the appropriate scientific disciplines examines the existing records. At present, however, the condition of particular children is uncertain; all that is clear is that many have symptoms of serious problems and that if the underlying neurological disorders, if any, remain undiagnosed and untreated much longer, the prognosis for these children, who are nearing adolescence, is poor. *See* Tr. at 495–98 (Testimony of Dr. Cohen); Tr. at 715–16 (Testimony of Dr. Ma), Tr. at 873–75 (Testimony of Dr. Gittleman); Affidavits of Drs. Feldman and Copeland (Plaintiffs' Exhibits 410(a) and 411).

33. The forty-five foreign infant plaintiffs who reside in France have not and are not likely to receive the appropriate diagnostic examinations promptly through the French social security and public health system. Tr. at 1784–87 (Testimony of Dr. Dugas); Tr. at 852–57, 868–73 (Testimony of Dr. Gittleman). The testimony of plaintiffs' experts on this point was more credible than that of defendant's experts, and is supported by the undisputed fact that few, if any, of the French children have yet received comprehensive neurological examinations through the public health care system.

34. Defendant has presented testimony and affidavits from expert witnesses that the children residing in West Germany, Canada, the United Kingdom, Sweden, Italy, Finland, Switzerland, and Belgium can receive free or substantially free diagnostic evaluations and treatment through the public health care system of their country or province. Defendant's Exhibits 1573–80; 1589–90. Plaintiffs have not presented qualified expert testimony contradiciting these affidavits. The plaintiffs residing in countries other than France have not yet offered sufficient evidence to support a finding that public medical service is not reasonably available for provision of diagnostic examinations and treatment.

35. The French plaintiffs will not receive appropriate diagnostic examinations for many years if this Court does not act now. The first of the cases involving French plaintiffs is just now being tried. It will take about a month before the case can go to the jury. Even if the judges of this Court were to try the other 44 cases of French plaintiffs seriatim, disposition by trial on the merits would take five to six years or more. Defendant claims that settlement of all the foreign cases is likely to follow after two or three trials. The Court relied on similar assurances in 1980 during the "bellwether" trials, to the detriment of these infants. In light of the whole history of this litigation, it will require much time, exhaustive discovery, reams of motions, exhibits, and affidavits, numerous trials, and lengthy appeals before the parties will seriously negotiate a comprehensive settlement. And should individual cases be dismissed by trial judges on the grounds that this forum is not convenient, relief on the merits for these children will be even further delayed.

36. Some of the foreign infant plaintiffs can reasonably be expected to receive appropriate diagnostic treatment in the absence of action by the Court. Magali Mau-

point, whose case is now on trial, has already received the exhaustive medical examinations by numerous experts that always immediately precedes a trial. And eight of the foreign infants who recently filed amended complaints received $5,000 each on March 19, 1984. It was reasonable in 1979 and 1980 for the guardian to expend all of the $5,000 payments on medical and legal efforts keyed to preparation for bellwether trials in light of the expectations of prompt settlement; it is not reasonable in 1984. The Court expects that the $5,000 received by these eight children will be expended, in whole or part, to obtain appropriate diagnostic examinations for them now.

37. The cost of diagnosis and interim treatment of the foreign infant plaintiffs is bitterly disputed. Plaintiffs' accountant submitted a report suggesting that diagnostic examination *and* interim treatment for 73 foreign infant plaintiffs would cost $8,702,744. Comprehensive *diagnostic* examinations alone for 52 plaintiffs were estimated to cost $312,113. Plaintiff's Exhibit 428, Table A. The affidavit of the guardian *ad litem* states that the medical bills for the "screening" examinations of 53 plaintiffs exceeded $240,000. Plaintiff's Exhibit 429. Defendant presented evidence and elicited testimony, some of it from plaintiff's own experts, that the costs should be significantly lower. The precise cost is difficult to estimate in part because the specialists cannot always say exactly which further tests are required for a particular child on the existing record. In light of the circumstances, however, the examinations should not be delayed to determine these precise costs. Taking into account all the evidence, it is apparent that the cost of diagnostic examinations for the 40-odd French plaintiffs other than Maupoint and the recent $5,000 recipients should not exceed $450,000.[5]

5. Many of the French children have already received "screening" examinations, but a number have not. The testimony critical of the procedures used in the screening examinations indicates that some of them may be repeated in the course of the comprehensive diagnostic examinations. The Court has found that if, by plaintiffs' own estimates, diagnostic and screening examinations for 52–53 children would cost less than $550,000, the cost of diagnostic exami-

38. Juries are likely to conclude that each of these foreign infant plaintiffs should recover the costs of thorough diagnostic examinations from the defendant. Juries are extremely likely to conclude that exposure of these infant plaintiffs to the trauma of the crash put them at risk of brain damage and aggravation of any pre-existing deficits they may have had. Juries may in a particular case conclude that a child is not injured or that his or her injury was not a proximate result of the crash. But plaintiffs' evidence that the crash created a potential for neurological injury or for aggravation of pre-existing injuries is so overwhelming, and defendant's evidence to the contrary so unpersuasive, that juries are likely to conclude that defendant's actions created the need for diagnostic examinations to determine whether injury or aggravation in fact occurred.

39. Defendants adduced evidence that many of these plaintiffs were at an orphanage in Vietnam called Phu My for varying periods before they boarded the ill-fated flight and that Phu My was unsanitary and disease infested. Defendants contend that despite this adverse environment few, if any, of the infant plaintiffs suffer from any physical or mental deficits and that these few deficits are caused by their pre-crash environment and not by the crash. Even assuming that some plaintiffs had pre-crash deficits, such plaintiffs are likely to prevail on the merits of their claim that the crash put any child with pre-existing deficits at risk of additional injury or aggravation of pre-existing deficits sufficient to require the same diagnostic examinations after the crash as are required for a child who was completely healthy and normal before the crash.

## II. SUPPLEMENTAL CONCLUSIONS OF LAW

1. Based on the findings of fact contained herein and in the Memorandum of March 16, 1984, it is not necessary to sup-

plement the conclusions in the March 16, 1984 Memorandum that plaintiffs are not entitled on the present record to (a) a partial summary judgment awarding them the costs of medical treatment *pendente lite*, (b) a preliminary injunction awarding them the cost of medical treatment and educational assistance *pendente lite*, (c) attorneys' and guardian's fees incurred in presenting and arguing these motions. As noted in the March 16, 1984 Memorandum, the Court of Appeals has held that each plaintiff's claim that he was injured by the crash, and that he requires treatment for those injuries, must be tried separately. *Schneider v. Lockheed Aircraft Corporation*, 658 F.2d 835 (D.C.Cir.1981), *cert. denied*, 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). Under that holding this Court cannot require medical treatment for the entire group of foreign infant plaintiffs based on even the persuasive medical evidence in the record here that many members of the group are seriously injured. As explained below, diagnostic examinations are a different matter because the Court can, consistent with *Schneider*, conclude that the entire group of foreign infant plaintiffs was placed *at risk* of injury by the crash, and that diagnostic examinations are necessary to determine whether the risk has become reality in particular cases. Plaintiffs are not precluded from filing motions for relief based on evidence, for example from the diagnostic examinations, that a particular child is in need of particular interim treatment and is entitled to have defendant provide it prior to trial on the merits.

2. As previously noted, under the unique circumstances of this case, in which defendant has stipulated to liability for the crash, plaintiffs as a matter of law are entitled to a partial summary judgment that defendant is liable to each plaintiff for the costs of obtaining such diagnostic examinations as the trier of fact concludes are reasonable under the circumstances.

nations for the 40-odd French children is unlikely to exceed $450,000. The Court makes no

findings as to the cost of interim treatment for any of the foreign plaintiffs.

3. Upon consideration of all the circumstances of the crash and all the medical evidence, the Court concluded that each of the foreign infant plaintiffs is likely to persuade a trier of fact that comprehensive diagnostic examinations, including in most if not all cases neurological examinations, are reasonable under the circumstances of this crash. On this issue plaintiffs' proof so far exceeds the "substantial likelihood of success" standard, *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir. 1977), that it approaches the point where no reasonable jury could conclude to the contrary. Whether or not a jury concludes that a particular child is in fact injured or whether that injury was in fact caused by the crash, it is extremely likely to conclude that the crash put each child at risk of sustaining neurological injury and at risk of aggravation of any pre-existing neurological injury or disorder. All of the foreign infant plaintiffs are therefore substantially likely to succeed on the merits of their claim that defendant should reimburse them for the expense of comprehensive diagnostic examinations.

4. The Court has found as a fact that, in the absence of interim relief, the French foreign infant plaintiffs are unlikely to obtain thorough diagnostic examinations until their cases are tried. It has found as a fact that trial of most of the French cases, with the exception of *Maupoint,* is unlikely to take place for several years. Given the age of these plaintiffs and the potential for irrevocable deterioration of their condition if their alleged injuries remain undiagnosed and untreated in the years before their cases can be tried, recovery of money damages at a trial on the merits is not an adequate legal remedy (or legal substitute) for the equitable remedy of in-kind provision of diagnostic examinations now. This conclusion that legal remedies are inadequate is based on factors, unique to this litigation, that include the extraordinary delay in reaching trials on the merits inherent in the litigation tactics of defendant and third-party defendant and in the limited trial time available to the judges of this

Court. In view of that significant delay, and of the overwhelming likelihood that once trials on the merits take place juries will reimburse plaintiffs for the costs of thorough diagnostic examinations, it would be inequitable to delay those examinations due to current inability of the plaintiffs to obtain and pay for them.

5. Nine plaintiffs will not be irreparably injured if the Court fails to require in-kind provision of diagnostic examinations. Magali Maupoint has already received the appropriate examinations. The guardian *ad litem* holds $5,000 each in trust for D. Bellard, V. Bellard, S. Blank, M. Fressange, S. Josefsson, D. Nicot, P. Olliges, and D. Picavet. No reason has been shown why these $5,000 payments can not be expended on thorough diagnostic examinations for each of these eight plaintiffs. Unless and until the guardian demonstrates why the interests of these children would be better promoted by expenditure of the $5,000 payments on some other matter, the Court concludes that their diagnostic needs will be covered by these payments. Should the expense of diagnostic examinations for one of these children exceed $5,000, the guardian may on appropriate motion with supporting affidavit apply for reimbursement from the fund created by today's order.

6. On the existing record, the Court cannot conclude as a matter of law that infants residing in West Germany, Canada, the United Kingdom, Sweden, Italy, Finland, Switzerland, and Belgium will be irreparably injured in the absence of Court-ordered diagnostic examinations. As to France, there was contradictory expert testimony on the availability, accessibility, quality, and timeliness of public diagnostic services, and the Court resolved these factual disputes in favor of the French plaintiffs. As to the other foreign countries, however, expert testimony that is as yet unrebutted suggests that public diagnostic services are available at nominal or no cost to the plaintiffs. Plaintiffs residing in countries other than France must accordingly be excluded from the preliminary in-

junction. Upon good cause shown, the Court will consider reopening the record with respect to availability of diagnostic services in countries other than France.

7. As defendant properly notes, it will incur some hardship if it provides diagnostic examinations to a particular plaintiff and a jury subsequently finds that the appropriate diagnostic examinations for that particular plaintiff under the circumstances of the crash are less extensive than those provided by the defendant. Defendant also properly argues that it is entitled to have plaintiffs post a bond adequate to protect it from the remote possibility that, in a particular case, (a) defendant will incur expenses in providing a diagnostic examination; (b) a jury will not award plaintiffs damages sufficient to cover the costs of that examination; and (c) plaintiff will not have funds to reimburse defendant for that examination. *Cf.* Fed.R.Civ.P. 65(c); *Systems Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3d Cir.1977).

At the same time, it is apparent that if plaintiffs had sufficient funds to post a bond covering the full cost of the diagnostic examinations, they would also have enough money to purchase the examinations on their own. The evidence revealed that plaintiffs do not have such extensive resources. The preliminary injunction is accordingly tailored to protect defendant without imposing an unreasonable bond on plaintiffs. Plaintiffs will be required to post a bond of $100 simultaneously with defendant's deposit of funds into the Registry of the Court on account toward provision of diagnostic examinations for the French infants. Plaintiffs have assembled a team of experts to perform such diagnostic examinations on each child as seem appropriate under the circumstances. Plaintiffs will submit vouchers detailing the examination performed, the child it was performed on, and the cost. Before any funds are paid from the Registry of the Court to reimburse that cost, the Court will afford defendant a limited opportunity to suggest in writing that, in light of the medical records on the particular child, a jury is unlikely to find that the particular examination is reasonable under the circumstances, and that the bond should accordingly be increased to cover the cost of that examination. There will be no discovery, testimony or oral argument. Aside from protecting defendant from undue hardship, this procedure should also help to insure that reliable, contemporaneous accounting of expenditures is made. *See Friends for All Children, Inc. v. Lockheed Aircraft Corporation*, 567 F.Supp. 790, 799 (D.D.C. 1983).

8. The hardship to the defendant can be further minimized by requiring the funds deposited into the Registry to be invested in an interest bearing account, and by providing that balance plus interest remaining in the fund following the examinations shall be refunded to the defendant on a date certain absent good cause shown by plaintiffs. The Court notes that by plaintiffs' own rough estimates, it would cost only slightly more than $550,000 to provide the screening and the more comprehensive supplemental diagnostic examinations to 52 children. Since only 40-odd children are covered by the preliminary injunction, $450,000 should, absent exceptional and unforeseen circumstances, adequately reimburse expenses incurred in the provision of comprehensive diagnostic examinations. This fund will be expended to provide comprehensive diagnostic examinations to the French children, and not to recompense these children for examinations already performed. Notwithstanding contrary indications in the Memorandum of March 16, 1984, the Court cannot as a matter of law require the defendant to pay for examinations that have already been performed. It can, however, require defendant to provide examinations that have not as yet occurred.

9. The Court has considered the guardian *ad litem*'s submission of March 9, 1984, concerning the team of experts who will perform the diagnostic examinations, and defendant's objections to the team filed March 15, 1984. Defendant's primary objection is that the experts are not independent, but are rather persons retained by plaintiffs to testify in this litigation. De-

fendant fails to note two attributes of the proposed team of experts that substantially minimize the hardship it may bear due to this preliminary injunction: Dr. Dugas, the proposed director of the team, states that the examinations can be performed in France, thereby minimizing the travel expenditures defendant will incur, and many of the team members are French, thereby further reducing travel expenses.

The Court concludes that plaintiffs should be examined by experts of their choice given the intimacy of the physician-patient relationship. To minimize prejudice to the defendant, however, examinations should be performed by French experts in France to the maximum extent feasible. This will have an added public benefit: French experts are more likely to be familiar with the French public health system and to be able to advise the French plaintiffs how to effectively seek appropriate treatment for any injuries through that system, thus mitigating their damages.

10. This preliminary injunction is also in the public interest to the extent that it promotes settlement of these cases prior to lengthy trials on the merits. Defendant has repeatedly insisted that it requires exhaustive medical information on each particular plaintiff before it will consider settlement, and that the more than 12,000 pages of medical and educational records already produced do not satisfy that standard in a single case. Assuming *arguendo* that this contention is made in good faith, defendant should be able to make settlement offers for particular plaintiffs once it receives the complete medical records generated by the comprehensive diagnostic examinations mandated by today's order. Accordingly, as these diagnostic examinations proceed, the Court will entertain appropriate discovery requests from the defendant should it establish the good faith of a proposal to settle cases.

11. Defendant need not seek, and this Court will not entertain, a motion to stay the provisions of today's order pending appellate review. Such a stay is unnecessary since the only action immediately required

of defendant is the payment of funds into the Registry of the Court on account toward the provision of diagnostic examinations. No funds will be distributed from the Registry to the guardian until a voucher is submitted by the guardian detailing expenses incurred or anticipated and defendant has had an opportunity to respond. The minimal hardship imposed on defendant in such circumstances—the deposit of funds into an interest bearing account—is more than outweighed by the overwhelming damage to the plaintiffs caused by a stay. If today's order were to be stayed pending an appeal of uncertain duration, the last hope of many of these plaintiffs for timely diagnosis and treatment before adolescence might be sacrificed. As noted in the findings of fact, a number of factors not the fault of these infant plaintiffs have led to an unconscionable delay in the resolution of their claims on the merits. After nine years, any further stay of the provision of diagnostic examinations will operate substantially to deny plaintiffs the preliminary relief to which they are entitled.

The Court is well aware that a mandatory preliminary injunction is extraordinary. But like *Cole v. Lynn*, 389 F.Supp. 99 (D.D.C.1975), this litigation is extraordinary. It is the exceptional situation described by our Court of Appeals in a different but related context:

> Once in a great while, a case comes before this court which makes one wonder whether the judicial system is still equipped to deal with a litigant determined to frustrate the workings of justice. Unfortunately, this is such a case.

*International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1332 (D.C.Cir.1972).

## ON APPLICATION OF THE ADVERSE INFERENCE RULE

These findings and conclusions supplement, and are summarized in, the findings and conclusions in the Memorandum of March 16, 1984, which is attached as an exhibit. They should be read in conjunction with that memorandum. Together, these two documents explain the Court's

ruling of February 23, 1984 in No. 76–0544–68 that plaintiff is not permitted to attempt to persuade a trier of fact to draw inferences adverse to the defendant from the destruction of evidence which has occurred.[1]

This ruling, while applying directly only to the *Maupoint* case, was expressly considered by the Court in limiting considerably the preliminary relief recently sought by plaintiffs. Memorandum of March 16, 1984, at 3 n. 2. The interrelated rulings on adverse inference and on plaintiffs' motion for a preliminary injunction arise out of a common nucleus of fact, and have accordingly been certified to the Court of Appeals pursuant to 28 U.S.C. § 1292(b).[2]

I. *Supplemental Findings of Fact*

1. The Court's Memorandum of January 31, 1984, concluded that the Stipulation of Compromise Settlement of August, 1982 does not preclude plaintiffs from attempting to persuade triers of fact to draw inferences adverse to the defendant from the destruction of relevant evidence. All explicit and implicit findings of fact in that memorandum are incorporated by reference herein.

2. Magali Maupoint, like almost all the foreign infant plaintiffs, was a passenger in the aft troop compartment of the C–5A at the time of the crash. The parties vigorously dispute whether her injuries, if any, were caused by the crash. Lockheed and the United States have taken the position here, as in previous cases, that because the troop compartment allegedly slid to a relatively gentle landing, and because relatively mild forces were allegedly felt by its occupants, the crash could neither cause nor aggravate Magali Maupoint's injuries, if any. Plaintiffs contend, to the contrary, that the troop compartment was subjected to violent jolts of great force that could and did cause Maupoint and the other foreign infant plaintiffs serious injuries. It is apparent that the condition of the interior of the troop compartment, the seats in it, and its passengers after the crash is highly relevant to this dispute.

3. Numerous photographs were taken of the accident scene and the wreckage following the crash. More than 1000 photographs of the scene and the wreckage were taken by government employees, most during the course of the Air Force Accident Investigation but some shortly after the crash. Slides, motion pictures, and videotapes were also taken of the scene and the wreckage. In addition, numerous photographs of the accident scene were taken by Lockheed employees who were technical advisors to the Aircraft Accident Board which was conducting the Accident Investigation.

4. The numerous photographs included photographs of the interior of the troop compartment. It is clear from the prior testimony that one Lockheed technical advisor alone took many pictures of the troop compartment interior. Testimony of John Edwards in *Schneider v. Lockheed Aircraft Corporation,* C.A. No. 76–0544–1, pp. 2372–2373. *But see* Tr. at 2395–98; 2402–06 (subsequent testimony of John Edwards that he took only one or two or three or four photographs of troop compartment interior). Weighing the credibility of Mr. Edwards, the testimony of another Lockheed employee that he would expect that photographs of the troop compartment interior would normally be taken, Tr. at 2261, and the undisputed fact that several photographers in addition to Mr. Edwards were at work at the accident site, the Court finds that a substantial number of the hun-

---

1. The Court has already issued supplemental findings of fact and conclusions of law supporting the February 23, 1984, entry of a partial summary judgment and a preliminary injunction. *See* Memorandum of April 4, 1984.

2. An appeal of the preliminary injunction was noticed by defendant on April 9, 1984. As of yet, plaintiffs have not noted any cross-appeal of rulings denying substantial portions of the inter-

im relief they sought in conjunction with their motion for a preliminary injunction. On April 12, 1984, plaintiffs did move for certification of the adverse inference ruling of the Court. The Court granted the motion and certified the adverse inference ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Order of April 16, 1984.

dreds of photographs taken at the site were of the interior of the troop compartment.

5. Lockheed Aircraft Corporation has known since April, 1975, that numerous photographs and motion pictures of the accident site were taken in the course of the Accident Investigation. Lockheed knew that many photographs were taken because its employees were present at the crash site when many of the photographs were taken by Air Force employees, because many photographs of the crash site were taken by Lockheed employees, because Lockheed employees saw many of the pictures after they were developed at Clark Air Force Base in the Phillipines, and because Lockheed officials were informed about the existence of motion picture footage in 1975.[3] *See* Tr. at 2382, 2472.

6. Prior testimony admitted into evidence indicates that at least one Lockheed employee believed that any photographs not included in the Accident Report of the Aircraft Accident Board would be destroyed by the Air Force. Deposition of C. Lovelace, September 19, 1981, at 27–31. There was testimony in the January, 1984 hearings that several Lockheed employees had the erroneous impression that Air Force regulations contemplate that photographs not attached to the Accident Report are to be destroyed following the issuance of the report. Tr. at 2475 (Testimony of C. Lovelace).

7. Numerous pictures of the interior of the troop compartment therefore once existed, and a substantial number of them were taken by employees of Lockheed Aircraft Corporation. These pictures would be highly relevant to a central disputed issue in the *Maupoint* case: whether the impact of the crash on the interior of the troop compartment could and did injure this foreign infant plaintiff. Only a small fraction of the pictures of the interior of

the troop compartment that once existed have ever been produced. Plaintiff claims that only five have been produced (*see* Plaintiff's Exhibits 1000–45, 1000–46, 1000–47, 10(c) and 3510). Defendant argues that there are four other photographs that also document the interior of the troop compartment. Defendant's Proposed Finding of Fact No. 197. Even assuming that these additional photographs are of the troop compartment interior (and the Court does not so find), it is clear that the scanty assortment of pictures now available is substantially less than the complete array of interior photographs that once existed, and that additional photographs that have not been produced would shed considerable new light on whether or not this crash could have caused serious neurological injury to the occupants of the troop compartment.

8. It appearing that numerous relevant and non-cumulative photographs of the interior of the troop compartment existed and have not been produced, it must be determined why these photographs have not been produced. The causation is complex indeed. Under Air Force regulations, two parallel investigations of the Saigon Air Crash took place: The first was the Air Force Accident Investigation, which was conducted by a multi-member Aircraft Accident Board headed by General Warner Newby. To facilitate the Board's work and to assure rapid corrective action to prevent future accidents, the report of this Board (the "Accident Report") is generally privileged from discovery in litigation. A.F.R. 127–4; *Machin v. Zuckert*, 316 F.2d 336 (D.C.Cir.), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); *Weber Aircraft Corp. v. United States*, 52 U.S. L.W. 4351 (1984). The second study of the crash was a Collateral Investigation, performed by Colonel Bernard Waxstein, which also resulted in a report (the "Collat-

---

**3.** The Court's finding that Lockheed knew of the existence of motion pictures in 1975 is based on documents concerning which defendant asserts work-product privilege. An appendix, to be filed under seal, and accessible only to defendant and to a court of competent jurisdiction,

rules that these privileges are inapplicable to particular documents and summarizes the relevant facts contained therein. Defendant may seek appellate review of the privilege rulings should today's findings be the subject of an appeal.

eral Report"). Under Air Force regulations, the Collateral Investigation is supposed to be provided all relevant original documents relating to the crash, including photographs. A.F.R. 110–14.3.e. The Collateral Report is not privileged, and can and has been used by all parties to this litigation.

9. Contrary to Air Force regulations, the Collateral Investigation of the Saigon Air Crash was not provided with all the photographs of the accident site and wreckage that were taken, but was rather given only the relative handful of photographs that were attached to the Accident Report prepared by the Aircraft Accident Board. As finally issued, the Collateral Report contained only eight photographs. As the Collateral Report was the subject of discovery at the earliest stages of this litigation, the Court finds that employees of Lockheed were aware as early as 1975 of the existence of numerous photographs, movies, and other relevant evidence that both the Court and the plaintiffs had no reason to know existed.

10. The Aircraft Accident Board completed the Accident Report on May 23, 1975. General Newby then authorized the destruction of the board materials, including photographs, that were not part of the report. Two Air Force officers, Major Walker and Colonel Bopp, then boxed extra sections of the Report and stored them at the 22nd Air Force Safety Office at Travis Air Force Base in California. The remaining materials, including many photographs, were destroyed in mid-1975. However, many other photographs (including duplicates of some that were destroyed) inadvertently survived because they were among the material in storage at Travis or because other military personnel retained them.

11. The first lawsuits involving the crash were filed shortly after the accident in various courts throughout the United States. The first filed in this district was *Pray v. Lockheed Aircraft Corporation,* No. 75–0874, on May 28, 1975. As early as June, 1975, plaintiffs in a case filed in the Southern District of Illinois (and consolidated with this multidistrict litigation on November 6, 1975) had propounded an interrogatory to Lockheed explicitly inquiring as to the existence of photographs. *See Kaufman v. Lockheed,* C.A. 75–1844, Interrogatories filed June 18, 1975. *See* Interrogatory No. 4. In September, 1975, plaintiffs in *Pray* filed a request to inspect and copy certain documents including implicitly photographs. This discovery was stayed at the request of Lockheed pending resolution of a motion to transfer all of these cases to one district which was then pending before the Panel on Multidistrict Litigation. After the motion was granted and the cases were consolidated before Chief Judge Jones of this district, Lockheed sought to continue the stay until a committee of lead counsel for plaintiffs could be appointed. Thereafter, at a hearing before Chief Judge Jones on December 18, 1975, counsel for one of the plaintiffs expressed concern about the need for a protective order to ensure that relevant evidence would be preserved in the interim. Counsel for Lockheed thereupon assured Chief Judge Jones that "any relevant documents known to [Lockheed] have been preserved." (Tr. of 12/18/75 at 83).

12. Discovery concerning liability issues proceeded throughout 1976. At a deposition of two Air Force officials in October, 1976, counsel for the United States assured plaintiffs' counsel on the record that all photographs of the accident scene and wreckage had been turned over to the Collateral Investigation. Defendant's Exhibit 1632; Tr. at 2335. This statement was not correct.

13. In approximately December, 1977 or January, 1978, Air Force personnel destroyed the boxes of accident materials which had been stored at the Safety Office at Travis Air Force Base. The material destroyed included "tons" of photographs, negatives, slides, and film. Tr. at 2497. An Air Force attorney learned of this destruction between March and May, 1978, and promptly and properly notified trial counsel for the United States. Tr. at 2499–

2500. Trial counsel for the United States informed Lockheed of the destruction promptly, but failed to inform either the Court of the plaintiffs of the destruction. The first inkling given Court or opposing counsel came in March, 1980, after almost two more years of litigation. Counsel for both Lockheed and the United States were aware of the previous representation to the Court that "all documents known to [Lockheed] have been preserved" and had numerous opportunities in appearances before the Court between 1978 and 1980 to correct that representation. Tr. at 2345.

14. Between February 13, 1980 and June 4, 1981, plaintiffs filed thirteen sets of interrogatories in this litigation asking whether defendant Lockheed or its attorneys knew of any photographs or motion pictures of the accident scene. Plaintiffs' Exhibits 8123(a), 8127, 8131, 8135, 8139, 8143, 8147, 8151, 8159, 8163, 8167, and 8171. Lockheed's sworn answers stated that Lockheed and its counsel knew of "None other than that offered for inspection or made available to the parties during the liability phase of these cases." Plaintiffs' Exhibits 8125(a), 8128, 8132, 8140, 8144, 8148, 8152, 8156, 8160, 8164, 8168, and 8172. These sworn answers were not correct.

15. After the destruction of evidence was finally revealed, plaintiffs filed a motion for sanctions and engaged in extensive discovery. That discovery produced numerous photographs, slides, movies, and other evidence that had been the subject of previous discovery requests and had accidentally escaped destruction but had never before been produced. The discovery did not produce however, more than a handful of pictures of the interior of the troop compartment. A review of all the evidence suggests that many such photographs were destroyed in 1975 and many others were subsequently destroyed in 1977 and 1978.

16. Lockheed had knowledge of the many interior photographs that were not produced and exercised temporary control over those of them that were taken by John Edwards, a Lockheed employee who assisted in the 1975 Accident Investigation by the Air Force. In 1975, Edwards returned the photographs he took to the Air Force at a time when some Lockheed employees had reason to believe that the Air Force, in due course, destroyed photographs not attached to an Accident Report. *See* ¶ 6, *supra.* Also, the Air Force asserted privileges not available to Lockheed directly which had the affect of shielding evidence from discovery by plaintiffs.[4] Edwards testified that he believed that Air Force regulations required him to return the photographs to the Air Force. It is more likely than not that a significant number of non-cumulative photographs of the troop compartment interior so returned were destroyed in 1977 and 1978 and can therefore never be produced.

17. The Court finds as a fact that had Lockheed attempted in late 1975 and early 1976 to request or persuade the Air Force to locate and preserve the numerous photographs of the accident scene which Lockheed knew existed, the photographs would not have been destroyed in 1977 and 1978. Had reasonable efforts been made by counsel for Lockheed and by Lockheed executives, the Court and triers of fact would now have access to numerous photographs of the troop compartment interior. But for the absence of such efforts, the task of juries in deciding whether the force and impact of the crash was sufficient to cause neurological injury would have been an easier one. Instead, this issue involves much more difficulty and consumes much more trial time in each case than it should. Each case is decided on the basis of a handful of interior photographs and conflicting expert testimony based on extrapolations from tangential circumstantial evidence.

---

**4.** This finding relies in part on documents concerning which defendant Lockheed Aircraft Corporation asserts work-product privilege. An appendix, to be filed under seal and accessible only to defendant and to a Court of competent jurisdiction, rules that these privileges are inapplicable to particular documents and summarizes the relevant facts contained therein. *See* footnote 3, *supra.*

18. Lockheed returned photographs it possessed to the Air Force as quickly as possible, and failed to see to it that they were preserved (as Lockheed's counsel represented to Chief Judge Jones they were). *See also* Plaintiffs' Exhibit 8301; Tr. at 2394. But Lockheed did not destroy any photographs, nor did Lockheed participate in the events that led to the 1977 or 1978 destruction of photographs by the Air Force at Travis Air Force Base.

## II. *Supplemental Conclusions of Law*

1. The actions and inaction of the United States and Lockheed described in the findings of fact, while possibly sanctionable, have already been the subject of a motion for sanctions by the plaintiffs and lengthy hearings by the Court. The sanctions motion was dismissed with prejudice in 1982. The dismissal was one element of a comprehensive settlement in which 45 American infant plaintiffs received $13,-500,000 for their claims. The issue presently before the Court is therefore not whether the conduct described here is sanctionable,[5] but rather whether any or all of it can be considered by a trier of fact in deciding whether to apply the evidentiary principle known as the adverse inference rule. *See International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329 (D.C.Cir.1982). That rule is designed to help triers of fact ascertain the truth. Under certain circumstances, the trier of fact may be permitted to infer that missing evidence would be unfavorable to the party responsible for its absence. At issue is whether those circumstances obtain here.[6]

2. The Court's memoranda and orders in *Kurth v. Lockheed Aircraft Corporation*, C.A. No. 80–3223, stated that plaintiff Kurth would be permitted to ask the jury in her second trial to draw an inference adverse to Lockheed from the destruction of evidence which occurred in this case. Memorandum of February 1, 1983; Memorandum and Order of July 1, 1983; Order of September 7, 1983. As is apparent from these memoranda and orders, the Court was in the process of narrowing and defining the scope and applicability of the adverse inference rule as the second *Kurth* trial neared. *Kurth* was settled prior to the second trial on September 12, 1983.

3. In the instant proceedings, conducted subsequent to the *Kurth* settlement, the Court conducted lengthy hearings at which extensive evidence relating to the applicability of the adverse inference rule was admitted, including testimony, affidavits, and exhibits. On the basis of that more extensive record and the facts revealed in that record as noted above, the Court concluded that it would be incorrect as a matter of law to permit plaintiffs to introduce evidence before the jury concerning the destruction of documents or to ask the jury to draw inferences adverse to the defendant from that destruction.

The basis for that conclusion is discussed in paragraphs 24–26 of the Memorandum of March 16, 1984, and need not be belabored again here. As the Court there noted, it is Lockheed Aircraft Corporation, and not the United States, that is the defendant here.[7] Under existing appellate precedents, to justify an adverse inference against Lockheed, plaintiffs would have to demonstrate evil intent, bad faith, or willfulness on the part of Lockheed in the destruction of evidence sufficient to support a reasonable inference that the missing evidence was detrimental to Lockheed's case. *See Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975). Plaintiffs have failed to carry the

---

**5.** In particular, matters relating to the attempts to conceal the document destruction, such as Lockheed's incorrect sworn answers to interrogatories, *see* Supplemental Finding of Fact No. 14, *supra*, were the subject of the sanctions hearing and were settled in August, 1982.

**6.** The Court's Memorandum of January 31, 1984, concluded that the Stipulation of Compromise Settlement of August, 1982, does not pre-

clude plaintiffs from attempting to persuade triers of fact to draw inferences adverse to Lockheed from the destruction of relevant evidence which is described in the findings of fact above. All explicit and implicit conclusions of law in that memorandum are incorporated by reference herein.

**7.** The United States is a third-party defendant in a claim over by Lockheed.

intent element of this burden.[8] Plaintiffs have shown that Lockheed sought the protection of Air Force privilege claims, and indeed may have returned the photographs to the Air Force in the hope and expectation that they would be shielded by an Air Force privilege claim. But plaintiffs have not carried their burden of proving that Lockheed returned the photographs with a bad faith intent to facilitate the destruction by the Air Force which later transpired. Stated differently, plaintiffs have not adequately shown that Lockheed *"willfully* permitted ... the photographs to be lost or destroyed." *Gumbs v. International Harvester, Inc.,* 718 F.2d 88, 97 (3d Cir.1983) (emphasis added).

In addition, the recent hearings demonstrate that in attempting to prove bad faith and evil intent, plaintiffs would have to bring evidence concerning Lockheed's alleged misconduct abroad and in unrelated matters before the jury. Such evidence would be more prejudicial than probative and might well divert the jury's attention from the central issues in the case.

Accordingly, the February 23, 1984 Order precluded plaintiff Maupoint from introducing evidence concerning the destruction of evidence or attempting to persuade the jury to draw an adverse inference from that destruction.

---

**8.** It is notable that in a related context, which may or may not be germane, a party alleging evil intent or bad faith on the part of a defendant has a special burden which plaintiffs have also failed to carry here. Thus, in a civil case where plaintiff alleged fraud and misrepresentation in violation of the False Claims Act, 31 U.S.C. § 231, the Sixth Circuit has held that plaintiff must prove these allegations by "clear, unequivocal, and convincing evidence." *United States v. Ueber,* 299 F.2d 310 (6th Cir.1962). It is not necessary to decide whether to apply this higher substantive standard of proof to the adverse inference "intent" issue, although that higher standard might as a matter of law be appropriate. *See Alsco-Harvard Fraud Litigation,* 523 F.Supp. 790, 806 & n. 19 (D.D.C.1981).